1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    JOSE CARLOS CORDERO PELICO, et al.,        Case No. 25-cv-07286-EMC   (EMC)

8                      Petitioners,
                                                **ORDER GRANTING MOTION FOR**
9              v.                               **PRELIMINARY INJUNCTION**

10   POLLY KAISER, et al.,
                                                Docket No. 5
11                     Defendants.

12

13          Petitioners are five immigrants and asylum seekers detained by Immigration and Customs

14   Enforcement ("ICE") agents when they appeared for routine immigration proceedings.  Petitioners

15   Adriana Patricia Lezcano Rondon, Fredy Andres Reyes Gonzales, and Yessica Alejandra Malagon

16   Torres are asylum seekers from Columbia.  Petitioner Jacqueline Karina Mendoza Nunez is an

17   asylum seeker from Nicaragua. Petitioner Jose Carlos Cordero Pelico is a Guatemalan national.

18   Each petitioner appeared at San Francisco immigration court on August 28 for a scheduled

19   immigration hearing.  After the hearing, ICE arrested Petitioners in the courtroom hallway.

20   Petitioners filed a petition for a writ of habeas corpus and motion for temporary restraining order.

21   On August 29, the Court issued the TRO and ordered the Government to show cause why a

22   preliminary injunction should not issue.  The Court now **GRANTS** the preliminary injunction.[1]

23

24

25          [1] In a footnote to its opposition, the Government reserved its right to move to sever,
     arguing that group habeas petitions are improper.  *See Acord v. California*, No. 17-cv-01089, 2017
26   WL 4699835, at *1 (E.D. Cal. Oct. 19, 2017) ("There is no authority for permitting multiple
     petitioners to file a single habeas petition under 28 U.S.C. § 2254, and doing so generally is not
27   permitted.").  However, the Government has not moved to sever, and so the issue is not before the
     Court.
28

United States District Court
Northern District of California

# I.    STATUTORY BACKGROUND

The detention and removal of inadmissible noncitizens in the United States is governed by a complex statutory framework.

A.    Full Removal Proceedings and Discretionary Detention (§ 1226)

The "usual removal process" involves an evidentiary hearing before an immigration judge. *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 108 (2020). Proceedings are initiated under 8 U.S.C. § 1229(a), also known as "full removal," by filing a Notice to Appear with the Immigration Court. *Matter of E-R-M- & L-R-M-*, 25 I. & N. Dec. 520, 520 (BIA 2011). Section § 1226 provides that while removal proceedings are pending, a noncitizen "may be arrested and detained" and that the government "may release the alien on . . . conditional parole." § 1226(a)(2); *accord Thuraissigiam*, 591 U.S. at 108 (during removal proceedings, applicant may either be "detained" or "allowed to reside in this country"). When a person is apprehended under § 1226(a), an ICE officer makes the initial custody determination. *Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) (citing 8 C.F.R. § 236.1(c)(8)). A noncitizen will be released if he or she "demonstrate[s] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." *Id*. (citing 8 C.F.R. § 236.1(c)(8)).

"Federal regulations provide that aliens detained under §1226(a) receive bond hearings at the outset of detention." *Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (citing 8 CFR §§236.1(d)(1)). If, at this hearing, the detainee demonstrates by the preponderance of the evidence that he or she is not "a threat to national security, a danger to the community at large, likely to abscond, or otherwise a poor bail risk," the IJ will order his or her release. *Diaz*, 53 F.4th at 1197 (citing *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (B.I.A. 2006)). Once released, the noncitizen's bond is subject to revocation. Under 8 U.S.C. § 1226(b), "the DHS has authority to revoke a noncitizen's bond or parole 'at any time,' even if that individual has previously been released." *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 968 (N.D. Cal. 2019). However, if an immigration judge has determined the noncitizen should be released, the DHS may not re-arrest

1    that noncitizen absent a change in circumstance.  *See Panosyan v. Mayorkas*, 854 F. App'x 787,

2    788 (9th Cir. 2021).  Where the release decision was made by a DHS officer, not an immigration

3    judge, the Government's practice has been to require a showing of changed circumstances before

4    re-arrest.  *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017).

6    B.    Expedited Removal and Mandatory Detention (§ 1225)

7          While "§1226 applies to aliens already present in the United States," U.S. immigration law

8    also "authorizes the Government to detain certain aliens seeking admission into the country under

9    §§1225(b)(1) and (b)(2)," a process that provides for expedited removal.  *Jennings*, 583 U.S. at

10   303 (2018).  Under §1225, a noncitizen "who has not been admitted or who arrives in the United

11   States" is considered "an applicant for admission."  8 U.S.C. § 1225(a)(1).  For certain applicants

12   for admission, 8 U.S.C. § 1225 authorizes "expedited removal." § 1225(b)(1).  § 1225(b)(1)

13   provides that:

        "If an immigration officer determines that an alien (other than an alien described in
        subparagraph (F)) who is arriving in the United States or is described in clause (iii) is
        inadmissible under section 212(a)(6)(C) or 212(a)(7) [8 U.S.C. § 1182(a)(6)(C) or
        1182(a)(7)], the officer shall order the alien removed from the United States without
        further hearing or review unless the alien indicates either an intention to apply for asylum
        under section 208 [8 USCS § 1158] or a fear of persecution."

17   Sections 8 U.S.C. § 1182(a)(6)(C) and 1182(a)(7) respectively refer to noncitizens who are

18   inadmissible due to misrepresentation or failure to meet document requirements.  Clause (iii) of §

19   1225(b)(1) allows the Attorney General (who has since delegated the responsibility to the

20   Department of Homeland Security Secretary) to designate for expedited removal noncitizens "who

21   ha[ve] not been admitted or paroled into the United States, and who ha[ve] not affirmatively

22   shown, to the satisfaction of an immigration officer, that the alien has been physically present in

23   the United States continuously for the 2-year period immediately prior to the date of the

24   determination of inadmissibility under this subparagraph." § 1225(b)(1)(A)(iii)(II).

25         To summarize, under § 1225(b)(1), two groups of noncitizens are subject to expedited

26   removal.  First, there are "arriving" noncitizens who are inadmissible due to misrepresentation or

27   failure to meet document requirements.  The implementing agency regulations define "arriving

28

United States District Court
Northern District of California

alien" as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2 .[2]  The second group – designated noncitizens – includes noncitizens who meet all of the following criteria: (1) they are inadmissible due to lack of a valid entry document or misrepresentation; (2) they have not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (3) they are among those whom the Secretary of Homeland Security has designated for expedited removal. *Thuraissigiam*, 591 U.S. at 109; § 1225(b)(1).

"Initially, DHS's predecessor agency did not make any designation [under (3)], thereby limiting expedited removal only to 'arriving aliens,'" that is, noncitizens encountered at ports of entry. *Make the Rd. N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 U.S. Dist. LEXIS 169432, at *14 (D.D.C. Aug. 29, 2025).  In the following years, DHS extended by designation expedited removal to noncitizens who arrive by sea and who have been present for fewer than two years, and to noncitizens apprehended within 100 air miles of any U.S. international land border who entered within the last 14 days.  *Id.*  This was the status quo until January, 2025, when the Department of Homeland Security revised its § 1225 designation to "apply expedited removal to the fullest extent authorized by statute."  Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025).  Under this designation, expedited removal applies to noncitizens encountered *anywhere* within the United States, who have been in the United States for less than two years and are inadmissible for lack of valid documentation or misrepresentation.  In short, expedited removal was expanded to apply for the first time to vast numbers of noncitizens present in the interior of the United States.

---

[2] The full definition reads: "Arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked. However, an arriving alien who was paroled into the United States before April 1, 1997, or who was paroled into the United States on or after April 1, 1997, pursuant to a grant of advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, will not be treated, solely by reason of that grant of parole, as an arriving alien under section 235(b)(1)(A)(i) of the Act."

Under the expedited removal statute § 1225(b)(1), if an applicant "indicates either an intention to apply for asylum" or "a fear of persecution," the immigration officer "shall refer the alien for an interview by an asylum officer." §§ 1225(b)(1)(A)(i)–(ii). If the asylum officer determines that the applicant has a "credible fear," the applicant "receive[s] 'full consideration' of his asylum claim in a standard removal hearing." *Thuraissigiam*, 591 U.S. at 110. If the officer determines there is no "credible fear," the officer "shall order the alien removed from the United States without further hearing or review." § 1225(b)(1)(B)(iii). However, the officer's decision may be appealed by the applicant to an immigration judge, who must conduct the review "to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination." *Id.* Detention under § 1225(b)(1) is "mandatory" "pending a final determination of credible fear of persecution and if found not to have such a fear, until removed." *Id.* (citing §1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed.")

§ 1225 also contains a provision that applies to applicants for admission not covered by §1225(b)(1). *Jennings*, 583 U.S. at 287. This provision, 1225(b)(2), states that, subject to statutory exceptions, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a [full removal proceedings] of this title." § 1225(b)(2). In other words, noncitizens subject to 1225(b)(2) are not eligible for expedited removal but are subject to mandatory detention while their full removal proceedings are pending. This is in contrast to the default detention regime under § 1226(a), which allows for discretionary release and review of detention through a bond hearing.

*C.*    The Government's Recent Change in Position

Until this year, the DHS has applied §1226(a) and its discretionary release and review of detention to the vast majority of noncitizens allegedly in this country without valid documentation.

United States District Court
Northern District of California

1  This practice was codified by regulation. The regulations implementing the Illegal Immigration

2  Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") state that "Despite being applicants

3  for admission, aliens who are present without having been admitted or paroled (formerly referred

4  to as aliens who entered without inspection) will be eligible for bond and bond redetermination."

5  62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). In fact, the government has conceded in other contexts

6  that "DHS's long-standing interpretation has been that 1226(a) [discretionary detention] applies to

7  those who have crossed the border between ports of entry and are shortly thereafter apprehended."

8  Dkt. No. 17 (citing Solicitor General, Transcript of Oral Argument at 44:24–45:2, *Biden v. Texas*,

9  597 U.S. 785 (2022) (No. 21-954)). And in its briefing before this Court, the Government

10  acknowledges that "until recently," it considered § 1226(a) to be an available detention authority

11  for noncitizens who might also be subject to § 1225. Dkt. No. 15 at 6.

12       In 2025, however, the Government's policy changed dramatically. The DHS revised its

13  § 1225 designation to "apply expedited removal *to the fullest extent authorized by statute*."

14  Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139 (Jan. 24, 2025) (emphasis added).

15  The Secretary of Homeland Security memorandum directed federal immigration officers to

16  "consider . . . whether to apply expedited removal" to "any alien DHS is aware of who is

17  amenable to expedited removal but to whom expedited removal has not been applied." Dkt. No. 1

18  at ¶ 33. Officers are encouraged to "take steps to terminate any ongoing removal proceeding

19  and/or any active parole status."[3] *Id.* The memorandum states that DHS shall take the actions

20  contemplated by the memorandum "in a manner that takes account of legitimate reliance

21  interests," but states that "the expedited removal process includes asylum screening, which is

22  sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do

23  so in a timely manner." Huffman Memorandum (Jan. 23, 2025).

24       Since mid-May of 2025, the Department of Homeland Security has made a practice of

25  appearing at regular removal proceedings in immigration court, moving to dismiss the

---

[3] Section 1226(a) provides for discretionary "conditional parole" for non-dangerous noncitizens who do not present a flight risk; § 1182(d)(5)(A) separately provides for a case-by-case "parole" for "urgent humanitarian reasons or significant public benefit."

1  proceedings, and then re-arresting the individual in order to place them in expedited removal

2  proceedings.  Dkt. No. 1 at ¶¶ 35–40.  If the immigration judge does not dismiss the full removal

3  proceedings, ICE still makes an arrest, apparently in reliance on § 1225(b)(2)'s detention

4  provision.

5

6  ## II.    FACTUAL BACKGROUND

7

8       Jose Carlos Cordero Pelico came to the United States from Guatemala.  After being

9  initially detained by DHS on December 9, 2023, he was served with a Notice to Appear, charged

10 under Section 1182(a)(6)(A)(i) as an alien present without being admitted or paroled, and released

11 on his own recognizance under Section 1226 for "lack of space."  Dkt. No. 20-1.  He has no

12 criminal history.  Dkt. No. 1 at ¶ 51.

13      Fredy Andres Reyes Gonzales came to the United States from Columbia.  He fled

14 Columbia after he was tortured by members of the Revolutionary Armed Forces of Colombia, a

15 guerilla group.  Dkt. No. 6-2 at 4.  After being initially detained by DHS on May 4, 2024, he was

16 served with a Notice to Appear, charged under Section 1182(a)(6)(A)(i) as an alien present

17 without being admitted or paroled, and released on his own recognizance under Section 1226 for

18 "humanitarian reasons and a lack of detention space." Dkt. No. 16-1.  Mr. Reyes Gonzales has a

19 pending application for asylum.  Dkt. No. 1 at ¶ 56.  He has no criminal history.  *Id.*

20      Adriana Patricia Lezcano Rondon came to the United States from Columbia.  She fled

21 Colombia after she was harmed by two men because she protested against the activities of an

22 armed group.  Dkt. No. 6-2 at 3.  After being initially detained by DHS on February 19, 2024, she

23 was served with a Notice to Appear, charged under Section 1182(a)(6)(A)(i) as an alien present

24 without being admitted or paroled, and released on her own recognizance under Section 1226 for

25 "lack of bed space."  Dkt. No. 17-1.  She failed to appear at a scheduled hearing but subsequently

26 filed a Motion to Reopen, explaining that she appeared that day, but was misdirected to a different

27 floor in the building.  *Id.*  The Motion to Reopen was granted and removal proceedings resumed.

28 *Id.*  Ms. Lezcano Rondon has a pending application for asylum.  Dkt. No. 1 at ¶ 52.  She has no

United States District Court
Northern District of California

1   criminal history.  *Id.*

2          Jacqueline Karina Mendoza Nunez came to the United States from Nicaragua.  After being

3   initially detained by DHS on December 31, 2023, she was served with a Notice to Appear,

4   charged under Section 1182(a)(6)(A)(i) as an alien present without being admitted or paroled, and

5   released on her own recognizance under Section 1226 for "lack of space."  Dkt. No. 18-1.  On

6   August 28, 2025, her motion to change venue to Las Vegas was granted.  *Id.*  Ms. Mendoza Nunez

7   has a pending application for asylum.  Dkt. No. 1 at ¶ 54. She has no criminal history.  *Id.*

8          Yessica Alejandra Malagon Torres came to the United States from Colombia. She fled

9   Colombia after being threatened by members of a guerilla group.  Dkt. No. 6-2.  After being

10  initially detained by DHS on May 18, 2024, she was served with a Notice to Appear, charged

11  under Section 1182(a)(6)(A)(i) as an alien present without being admitted or paroled, and released

12  on her own recognizance under Section 1226 for "lack of bed space."  Dkt. No. 19-1.  Ms.

13  Malagon Torres has a pending asylum application.  Dkt. No. 1 at ¶ 53.  She has no criminal

14  history.  *Id.*

15         Each petitioner appeared at San Francisco immigration court on August 28, 2025 for

16  scheduled immigrating proceedings.  Dkt. No. 1 at ¶57.  In each case, the Government orally

17  moved to dismiss the full removal proceedings.  *Id.*  The immigration judge deferred the motion in

18  each case to allow Petitioners time to respond.[4]  *Id; accord* Dkt. No. 15 at 9.  When petitioners left

19  the courtroom, they were arrested in the hallway by ICE agents.  Dkt. No. 1 at ¶ 58.

20         The same day they were detained, Petitioners filed a petition for habeas corpus and a

21  motion for a TRO, which the Court granted on August 29, 2025.  Dkt. No. 10.  The Government

22  was ordered to release Petitioners from the Government's custody, to refrain from re-detaining

23  Petitioners without a pre-detention hearing before a neutral decisionmaker, and to refrain from

24  removing Petitioners from the United States.  *Id.*  The TRO was extended by stipulation of the

25  parties until October 3, 2025.  Dkt. No. 28.

26

27  _____

28  [4]  The Government incorrectly stated in its TRO opposition that the immigration judge granted
    DHS's motion to dismiss as to Petitioner Mendoza Nunez.  Dkt. No. 15 at n.3 (correcting the
    error).

1

2

### III.    LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [he or she] is likely to succeed on the merits, that [he or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [his or her] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008). "[I]f a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor and the other two Winter factors are satisfied.'" *All. for the Wild Rockies v. Peña*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)). The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).

### IV.    DUE PROCESS CLAIM

A.    Petitioners Are Likely to Succeed on the Merits, or at Least Raise Serious Questions

The Due Process Clause protects all persons within the United States from being "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. It is settled law that the Due Process clause applies to noncitizens within the United States "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693, 121 S. Ct. 2491, 2500, 150 L. Ed. 2d 653 (2001); *Trump v. J. G. G.*, ––– U.S. ––––, 145 S. Ct. 1003, 1006, 221 L.Ed.2d 529 (2025) ("It is well established that the Fifth Amendment entitles aliens to due process of law in the context of removal proceedings.").

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S. Ct. 2593, 2600, 33 L. Ed. 2d 484 (1972). The constitution typically "requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). This is particularly true when the

9

interest is in liberty, the loss of which cannot fully be compensated after the fact.

To determine what procedures are required, courts apply the three-part test of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  The Government argues that the *Mathews* test does not apply because the Supreme Court has not used the test to address due process claims raised by noncitizens.  *See Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022) ("[T]he Supreme Court when confronted with constitutional challenges to immigration detention has not resolved them through express application of Mathews.").  However, the Ninth Circuit has "assume[d] without deciding" that *Mathews* applies in the immigration detention context, *Diaz*, 53 F.4th at 1206-07; *see also Pinchi v. Noem*, No. 5:25-CV-05632-PCP, 2025 WL 2084921, at n. 2 (N.D. Cal. July 24, 2025) (collecting cases where the Ninth Circuit has applied Matthews in due process challenges to removal proceedings).  And many courts in this district have applied the *Mathews* test to noncitizens in circumstances similar or identical to those here.  *See e.g.*, *Calderon v. Kaiser*, No. 25-CV-06695-AMO, 2025 WL 2430609, at *3 (N.D. Cal. Aug. 22, 2025); *Ramirez Clavijo v. Kaiser*, No. 25-CV-06248-BLF, 2025 WL 2419263, at *5 (N.D. Cal. Aug. 21, 2025); *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025); *Hernandez Nieves v. Kaiser*, No. 25-CV-06921-LB, 2025 WL 2533110, at *4 (N.D. Cal. Sept. 3, 2025).

Those in Petitioners' position, noncitizens granted the liberty of release pending removal proceedings, have due process rights.  The breadth of those rights turns on the application of the *Mathews* test.  *Mathews* requires consideration of three factors: (1) the private interest affected; (2) the risk of an erroneous deprivation; and (3) the Government's interest.  *Mathews*, 424 U.S. at 335.  Here, all three factors suggest that Petitioners have a right to a pre-detention hearing before a neutral arbiter.

### 1.    Petitioners Have a Liberty Interest

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.  "A protected liberty interest may arise from a conditional release from physical restraint." *Rodriguez v. Kaiser*, No. 1:25-cv-01111-KES-SAB (HC), 2025 U.S. Dist.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    LEXIS 172756, at *8 (E.D. Cal. Sep. 4, 2025) (citing *Young v. Harper*, 520 U.S. 143, 147-49, 117

2    S. Ct. 1148, 137 L. Ed. 2d 270 (1997)).  "[E]ven when an initial decision to detain or release an

3    individual is discretionary, the government's subsequent release of the individual from custody

4    creates "an implicit promise" that the individual's liberty will be revoked only if they fail to abide

5    by the conditions of their release."  *Calderon v. Kaiser*, No. 25-CV-06695-AMO, 2025 WL

6    2430609, at *2 (N.D. Cal. Aug. 22, 2025) (citing *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)).

7    "The fact that a decision-making process involves discretion does not prevent an individual from

8    having a protectable liberty interest."  *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal.

9    2019).  Accordingly, a noncitizen released from custody pending removal proceedings has a

10   protected liberty interest in remaining out of custody.  *See e.g., Ramirez Clavijo v. Kaiser*, 25-cv-

11   06248-BLF, at 6 (N.D. Cal. Aug. 21, 2025) (collecting cases); *Romero v. Kaiser*, No. 22-cv-

12   02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022).

13        The Government argues that noncitizens in Petitioners' position "lack a liberty interest in

14   additional procedures not provided by the statute."  Dkt. No. 15 at 13.  But the Government relies

15   on cases where non-citizens sought additional procedure to challenge their *exclusion*.  *See United*

16   *States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) ("[w]hatever the procedure

17   authorized by Congress . . . is due process *as far as an alien denied entry is concerned*."  *Id.*

18   (emphasis added); *Landon v. Plasencia*, 459 U.S.21, 32 (1982) (no constitutional rights regarding

19   finding of *exclusion*); *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140 (2020) (non-

20   citizens had "only those rights *regarding admission* that Congress has provided by statute.").

21   None of these cases concerned "release from custody," *Thuraissigiam*, 591 U.S. at 115; they do

22   not address the due process rights of a noncitizen residing in the United States to remain free once

23   released.

24        In this case, Petitioners gained a liberty interest in their continued freedom when the DHS

25   elected to release them on their own recognizance.  Under *Morrissey,* this release implied a

26   promise that they would not be re-detained so long as they abided by the terms of their release.

27   *See e.g., Calderon*, 2025 WL 2430609, at *2.  That promise accords with the protections afforded

28   by statute.

1     Petitioners were released "[i]n accordance with section 236 [§1226] of the Immigration

2  and Nationality Act and the applicable provisions of Title 8 of the Code of Federal Regulations."

3  Dkt. No. 17-1.   Under federal regulation, DHS was authorized to release them under §1226 only

4  upon a determination that "such release would not pose a danger to property or persons" and that

5  they were "likely to appear for any future proceeding."  8 C.F.R. § 1236.1(c)(8).  DHS's decisions

6  to release Petitioners thus reflected "a determination by the government that [they were] not a

7  danger to the community or a flight risk."  *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D.

8  Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).  The

9  Government does not argue that circumstances have changed since it made this determination.

10  Indeed, the record before the Court indicates that Petitioners have complied with the obligations

11  set forth in their Notices to Appear, including by appearing for the immigration hearing at which

12  they were arrested.

13     A noncitizen detained under Section § 1226(a) has the right to contest their custody

14  determination before an immigration judge, at which time the government bears the burden to

15  prove that the detention is justified.  *Diaz v. Garland*, 53 F.4th 1189, 1196 (9th Cir. 2022) *citing* 8

16  C.F.R. §§ 236.1(d)(1); 8 CFR 1003.19; *dos Santos v. Noem*, No. 1:25-cv-12052-JEK, 2025 U.S.

17  Dist. LEXIS 157488, at *2 (D. Mass. Aug. 14, 2025).  This right becomes available at the "outset

18  of detention."  *Jennings v. Rodriguez*, 583 U.S. 281, 306 (2018) (citing 8 C.F.R. § 236.1(d)(1)).

19  Petitioners were rightfully released under Section 1226 since they were neither a danger nor a

20  flight risk, as a bond hearing would likely have been found, and they were entitled to maintain

21  their freedom while removal proceedings were ongoing absent a change in circumstances.  *See*

22  *Saravia*, 280 F. Supp. 3d at 1176.

23     The Government seeks to avoid the strictures of 1226(a) with its bond hearing protections

24  by asserting Petitioners have no protected liberty interest (or any statutory rights under §1226)

25  because they are subject to a different detention authority — § 1225(b) — which does not

26  contemplate pre-detention hearings.  Dkt. No. 15 at 12.

27     The Government concedes that Petitioners are currently in full removal proceedings under

28  Section 1229, and that while those proceedings are live, they cannot be simultaneously subjected

to Section 1225(b)(1)'s expedited removal proceedings.[5]  Dkt. No. 15 at 12.  But the Government asserts that it may nevertheless detain Petitioners under Section 1225(b)(2).  The Government argues that this provision provides for mandatory detention even while full removal proceedings are ongoing for any noncitizens considered "applicants for admission" who do not fall under § 1225(b)(1).  In other words, the Government's position is that whether Petitioners are in full removal proceedings or not, and regardless of the authority under which it initially detained them, it may at any time subject them to detention without the possibility of release on bond because they are "applicants for admission" who are "seeking admission" and thus subject mandatory detention under § 1225(b)(2).

     a.   The Government's Attempt to Switch from Section 1226(a) to Section 1225(b)(2)

The Government's argument does not hold.  As a preliminary matter, whether the Government may have had the power to detain Petitioners under 1225(b), the reality is that the detention authority consistently applied by the government to Petitioners since their arrival in the United States has always been § 1226.  In 2023 and 2024, the Government placed Petitioners in normal removal proceedings under Sections §1229, not §1225(b)(1), and chose to release them on conditional parole under §1226(a), not hold them in detention under §1225(b)(2).  These actions created a reliance interest in Petitioners' continued freedom, so long as they abided by the terms of their release.  *See e.g.*, *Calderon v. Kaiser*, No. 25-CV-06695-AMO, 2025 WL 2430609, at *3 (N.D. Cal. Aug. 22, 2025) (recognizing a noncitizen's protected interest in continued liberty); *see also* Huffman Memorandum (Jan. 23, 2025) (recognizing that noncitizens granted discretionary parole have "reliance interests").

Sections 1226(a) and 1225(b) cannot be applied simultaneously.  Their detention regimes

---

[5] A district court recently stayed the Government's application of Section 1225(b)(1)'s expedited removal proceedings to "people living in the interior of the country who have not previously been subject to expedited removal."  *See Make the Rd. N.Y. v. Noem*, No. 25-cv-190 (JMC), 2025 LX 389496 (D.D.C. Aug. 29, 2025).

United States District Court
Northern District of California

United States District Court
Northern District of California

1   are facially inconsistent: one provides for discretionary release with procedural protections, while

2   the other mandates detention without discretion.  It is not possible for Petitioners to be

3   simultaneously subject to both detention regimes. Petitioners were, and are, subject to Section

4   1226(a), not 1225(b).

5          Petitioners enjoy a liberty interest under § 1226(a) and the procedural protections

6   thereunder that cannot be unilaterally abrogated without process by the Government simply

7   "switching tracks."  *See Lopez Benitez v. Francis*, No. 25 CIV. 5937 (DEH), 2025 WL 2371588,

8   at *5 (S.D.N.Y. Aug. 13, 2025) (refusing to credit the Government's post hoc litigation position

9   that its detention was under 1225(b) when it had consistently treated the petitioner as subject to

10  1226).

11

12              b.      The Limit of the Government's Authority under Section 1225(b)(2)

13         There is another reason why the Government cannot simply switch tracks from Section

14  1226(a) to 1225(b)(2) to detain Petitioners.  Section 1225(b)(2) does not give the Government the

15  broad detention power it now claims.

16         Petitioners argue that § 1225(b)(2) does not apply to noncitizens like them, who have been

17  released by DHS on their own recognizance into the interior of the country.  Dkt. No. 17 at 4.  A

18  number of district courts that have examined this issue in recent months have so held.  These

19  courts have rejected the Government's expansive construction of §1225(b)(2), which would allow

20  it to detain without a hearing virtually any noncitizen not lawfully admitted.  These courts

21  examined the text, structure, agency application, and legislative history of 1225(b)(2) and

22  concluded that it applies only to noncitizens "seeking admission," a category that does not include

23  noncitizens like Petitioners, living in the interior of the country.  *See Gomes v. Hyde*, No. 1:25-

24  CV-11571-JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025) ("[T]he plain text of Sections

25  1225 and 1226, together with the structure of the larger statutory scheme, indicates that Section

26  1225(b)(2) does not apply to noncitizens who are arrested on a warrant issued by the Attorney

27  General while residing in the United States."); *Lopez Benitez v. Francis*, No. 25 CIV. 5937 (DEH),

28  2025 WL 2371588, at *5 (S.D.N.Y. Aug. 13, 2025) (holding 1225(b)(2) "clearly" not applicable

14

1    to noncitizens who have resided in the country for years); *Rosado v. Figueroa*, No. CV 25-02157

2    PHX DLR (CDB), 2025 U.S. Dist. LEXIS 156344, at *29 (D. Ariz. Aug. 11, 2025) (finding that

3    the Government's "selective reading" of 1225(b)(2) "violates the rule against surplusage and

4    negates the plain meaning of the text"); *Martinez v. Hyde*, No. CV 25-11613-BEM, 2025 WL

5    2084238, at *8 (D. Mass. July 24, 2025) (rejecting the Government's "novel interpretation" that

6    1225(b) applies to noncitizens detained while present in the United States); *Rodriguez v. Bostock*,

7    779 F. Supp. 3d 1239, 1261 (W.D. Wash. 2025) (holding that Section 1226, not 1225(b)(2),

8    governed inadmissible noncitizens residing in the country).  This Court agrees with these

9    decisions, which accord the term "seeking admissions" its natural meaning.

10        To support its contrary construction that 1225(b)(2) requires mandatory detention for all

11   "applicants for admission," including non-citizens like Petitioners who reside in the country, the

12   Government points to a recent BIA decision agreeing with its interpretation and a district court

13   decision adopting the BIA ruling.  Dkt. No. 22 (citing *Matter of Jonathan Javier Yajure Hurtado*,

14   29I & N Dec. 216 (BIA 2025)); Dkt. No. 31.  In *Matter of Jonathan Javier Yajure Hurtado*, the

15   BIA held that Section 1225(b)(2) prescribes mandatory detention for all inadmissible noncitizens

16   living in the United States.  For the reasons discussed below, the Court finds the conclusion of the

17   vast majority of district courts more persuasive than the Government's position.[6]

18        First, the BIA decision is entitled to little deference.  *Loper Bright Enters. v. Raimondo*,

19   603 U.S. 369, 400 (2024) (observing that while "agencies have no special competence in resolving

20   statutory ambiguities," "[c]ourts do").  Under *Skidmore*, the "weight of such a judgment in a

21   particular case will depend upon the thoroughness evident in its consideration, the validity of its

22   reasoning, its consistency with earlier and later pronouncements, and all those factors which give

23   it power to persuade, if lacking power to control."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140

24   (1944).  In this regard, the BIA's current position is inconsistent with its earlier pronouncements.

25

26   ─────────────

27   [6] This Court previously found the BIA's new ruling unpersuasive and thus entitled to little
     deference.  *See Aceros v. Kaiser*, No. 25-cv-06924-EMC (EMC), 2025 U.S. Dist. LEXIS 179594,
     at *23 (N.D. Cal. Sep. 12, 2025).  As the Government has asked the Court to reconsider its
28   position in supplementary briefing, the Court includes its prior reasoning along with reasoning
     responsive to the new arguments made.

United States District Court
Northern District of California

1     Prior to its September 5 decision, the BIA issued three non-precedential decisions taking the

2     *opposite* position.  *See Martinez*, 2025 WL 2084238, at *8 (D. Mass. July 24, 2025).  In one

3     decision, the Board even stated that it was "unaware of any precedent" that would support the

4     Government's position.  *Id.*  Under *Loper*, the Court has no obligation to defer to the BIA's view,

5     particularly when that view has not "remained consistent over time."  *Loper*, 603 U.S. at 386; *see*

6     *also Skidmore*, 323 U.S. at 140.

7          Moreover, the BIA's reasoning lacks persuasive power for several reasons.

8                              i.

9          As with any question of statutory interpretation, the Court begins with the relevant

10    statutory provisions. § 1225(a) defines an applicant for admission as:

12         "[a]n alien present in the United States who has not been admitted or who arrives in the
       United States (whether or not at a designated port of arrival and including an alien who is
13       brought to the United States after having been interdicted in international or United States
       waters) . . ."

14    § 1225(b)(2)(A) states:

15

16    "[I]n the case of an alien who is an applicant for admission, if the examining immigration
       officer determines that an alien seeking admission is not clearly and beyond a doubt
17       entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of
       this title."

18

19         The Government argues and the BIA agreed that every noncitizen who has not been

20    lawfully admitted to the United States continues to be a noncitizen "seeking admission" and thus

21    subject to § 1225(b)(2).  In other words, it treats the phrases "applicant for admission" and

22    "seeking admission" as synonymous.

23         But this reading would render the phrase "seeking admission" in § 1225(b) superfluous.

24    To qualify for § 1225(b)(2), a noncitizen must (1) be an applicant for admission, (2) be "seeking

25    admission", and (3) be "not clearly and beyond a doubt entitled to be admitted."  If, as the

26    Government argues, all applicants for admission are deemed to be "seeking admission" for as long

27    as they remain applicants, then the phrase "seeking admission" would add nothing to the

28    provision.  This "violates the rule against surplusage."  *Lopez Benitez v. Francis*, No. 25 CIV.

United States District Court
Northern District of California

16

5937 (DEH), 2025 WL 2371588, at *6 (S.D.N.Y. Aug. 13, 2025); *see also United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432, 143 S.Ct. 1720, 216 L.Ed.2d 370 (2023) ("[E]very clause and word of a statute should have meaning."); *TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) ("[N]o clause, sentence, or word shall be superfluous, void, or insignificant.") (quoting *Duncan v. Walker*, 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)).

Moreover, the Government's and the BIA's reading of "seeking admission" is unnatural and ignores the tense of the term. As one district court observed:

> "[S]omeone who enters a movie theater without purchasing a ticket and then proceeds to sit through the first few minutes of a film would not ordinarily then be described as "seeking admission" to the theater. Rather, that person would be described as already present there. Even if that person, after being detected, offered to pay for a ticket, one would not ordinarily describe them as "seeking admission" (or "seeking" "lawful entry") at that point—one would say that they had entered unlawfully but now seek a lawful means of remaining there."

*Lopez Benitez*, 2025 WL 2371588, at *7.

In the face of the plain meaning, the Government now argues that "seeking admission" is a "term of art." Dkt. No. 29 at 4. Since Congress has not defined "seeking admission" as it has done for the phrase "applicant for admission," the Government attempts to support this assertion by looking to other statutory instances of the term.

These other statutory uses only reinforce that the plain meaning applies. For example, 8 U.S.C. § 1182(a)(9)(A) provides that a non-citizen previously ordered removed who "again seeks admission within 5 years of the date of such removal" is inadmissible. Likewise, 8 U.S.C. § 1182(a)(9)(B) provides that an alien unlawfully present for more than 180 days but less than a year who voluntarily departs and "again seeks admission within 3 years" is inadmissible. Neither of these provisions are inconsistent with the plain meaning of seeking admission; they contemplate that seeking admission is a present action, not a continuous state applicable to every noncitizen who already resides in the United States and seeks to obtain legal immigration status.[7]

---

[7] The Government's citation to a BIA decision interpreting these statutory provisions likewise undermines its argument against the plain meaning. *Lemus-Losa* held that a non-citizen inadmissible under 8 U.S.C. § 1182(a)(9)(B) [inadmissible due to reentry after unlawful presence]

ii.

The Government's and BIA's position is also at tension with the implementing regulation for § 1225(b).  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385-86 (2024) (implementing regulations may provide a "useful reference point for understanding a statutory scheme" when issued "contemporaneously").  8 C.F.R. § 235.3(c), which corresponds to Section 1225(b)(2), states that it applies to "*Arriving aliens* placed in proceedings under section 240 of the Act or aliens referred for an asylum merits interview under § 208.2(a)(1)(ii) of this chapter" and generally mirrors the language of 1225(b)(2) except that it replaces "applicant for admission . . . seeking admission" with "any arriving alien." (emphasis added).

8 U.S.C. § 1225(b)

> (2) Inspection of other aliens.
> (A) In general. Subject to subparagraphs (B) and (C), <u>in the case of an alien who is an applicant for admission, if the examining immigration officer determines that *an alien seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 240</u> [8 USCS § 1229a].

8 C.F.R. § 235.3

> (c) Arriving aliens placed in proceedings under section 240 of the Act or aliens referred for an asylum merits interview under § 208.2(a)(1)(ii) of this chapter.
> (1) Except as otherwise provided in this chapter, <u>*any arriving alien* who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to section 240 of the</u>

---

was precluded for qualifying for an adjustment of status.  In so holding, the BIA rejected the Seventh Circuit's view that "seeking admission" necessarily meant "lawful entry."  *Matter of Lemus-Losa*, 25 I. & N. Dec. 734, 739 (BIA 2012).  Rather, the BIA held that "seeking admission" was a term of art in the sense that it did not have to mean "actually requesting permission to enter the United States in the ordinary sense," of a "request for permission," but could apply to seeking entry lawfully *or unlawfully*.  *Id.* at 743, n.6.  But the BIA still understood seeking admission as an action that occurs "at some *point*," either through lawful entry, unlawful entry, or parole.  *Id.* (emphasis added).  This view of "seeking admission" accords with its plain meaning as a discrete temporal act, not an ongoing status that describes noncitizens residing in the interior.

The Government also cites to *Angov v. Lynch*, 788 F.3d 893, 898 (9th Cir. 2015), but this case concerned a non-citizen who presented himself at a port of entry without valid entry documentation and sought asylum.  Not only does this accord with the natural meaning of "seeking admission," the *Angov* Court emphasized that those "who have once passed through our gates, even illegally, are afforded the full panoply of procedural due process protections, and may be expelled only after proceedings conforming to traditional standards of fairness." *Angov v. Lynch*, 788 F.3d 893, 898 (9th Cir. 2015).

United States District Court
Northern District of California

Act shall be detained in accordance with section 235(b) of the Act. Parole of such alien shall only be considered in accordance with § 212.5(b) of this chapter. This paragraph (c) shall also apply to any alien who arrived before April 1, 1997, and who was placed in exclusion proceedings.
(Emphasis added.)

The regulation appears to contemplate that applicants *seeking admission* are a subset of applicants "roughly interchangeable" with "arriving aliens." *Martinez v. Hyde*, No. CV 25-11613-BEM, 2025 WL 2084238, at *6 (D. Mass. July 24, 2025). "Arriving aliens" are specifically defined by regulation as applicants for admission "coming or attempting to come into the United States at a port-of-entry." 8 C.F.R. § 1.2. This plainly does not describe petitioners who reside in the United States. Indeed, the DHS's Notice to Appear form similarly distinguishes between "arriving alien" and "alien present in the United States who has not been admitted or paroled." Dkt. No. 16-2.

☐ You are an arriving alien.
☒ You are an alien present in the United States who has not been admitted or paroled.
☐ You have been admitted to the United States, but are removable for the reasons stated below.

These regulations and forms presume that the term alien "seeking admission" has limited application, not the sweeping construction given to it by the BIA.

In rebuttal, the Government points to a sentence at the very end of 8 C.F.R. § 235.3(b)(1)(ii), which the Government argues gives § 1225(b)(2) a broader scope:

> (b) Expedited removal —
> (1) Applicability. The expedited removal provisions shall apply to the following classes of aliens who are determined to be inadmissible under section 212(a)(6)(C) or (7) of the Act:
>
> (i) Arriving aliens, as defined in 8 CFR 1.2;
>
> (ii) As specifically designated by the Commissioner, aliens who arrive in, attempt to enter, or have entered the United States without having been admitted or paroled following inspection by an immigration officer at a designated port-of-entry, and who have not established to the satisfaction of the immigration officer that they have been physically present in the United States continuously for the 2-year period immediately prior to the date of determination of inadmissibility. The Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, at any time, to

any class of aliens described in this section. The Commissioner's designation shall become effective upon publication of a notice in the Federal Register. However, if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Commissioner's designation shall become effective immediately upon issuance, and shall be published in the Federal Register as soon as practicable thereafter. When these provisions are in effect for aliens who enter without inspection, the burden of proof rests with the alien to affirmatively show that he or she has the required continuous physical presence in the United States. Any absence from the United States shall serve to break the period of continuous physical presence. *An alien who was not inspected and admitted or paroled into the United States but who establishes that he or she has been continuously physically present in the United States for the 2-year period immediately prior to the date of determination of inadmissibility shall be detained in accordance with section 235(b)(2) of the Act for a proceeding under section 240 of the Act.* (emphasis added.)

However, the language the Government cites is from the section of the regulations on "Expedited removal," corresponding to Section 1225(b)(1). In contrast, as discussed above, the section of the regulations that corresponds to 1225(b)(2) describes it as covering "Arriving aliens placed in proceedings under section 240 of the Act or aliens referred for an asylum merits interview under § 208.2(a)(1)(ii) of this chapter." Looking to the "the most pertinent regulatory guidance," the implementing regulations suggest that Section 1225(b)(2) covers only limited categories of non-citizen — arriving aliens placed in proceedings under section 240 of the Act or aliens referred for an asylum merits interview —, as opposed to all applicants for admission. *Flaherty v. Kanaway Seafoods, Inc.*, No. 23-4223, 2025 U.S. App. LEXIS 502, at *3 (9th Cir. Jan. 10, 2025).


                        iii.

        Another "fundamental canon of statutory construction" is that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Gundy v. United States*, 588 U.S. 128, 140–41, 139 S.Ct. 2116, 204 L.Ed.2d 522 (2019). Here, the Government's interpretation would "nullify" a recent amendment to the immigration statutes. *See Gomes v. Hyde*, No. 1:25-CV-11571-JEK, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025). Section 1226 generally establishes a discretionary detention framework, but provides that for certain noncitizens, detention is mandatory. Section 1226(c). In January of *this year*, Congress

1   amended Section 1226 to add an additional category of citizens subject to mandatory detention.

2   Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025).  This category includes noncitizens who

3   are (1) inadmissible under 1182(6)(A) [present without admission or parole], (6)(C)

4   [misrepresentation], or (7)(A) [lack of proper documentation] *and* (2) have been charged with one

5   of certain enumerated crimes.  *Id.*  If the Government's view is correct, however, all noncitizens

6   who are inadmissible are *already* subject to mandatory detention under § 1225(b)(2), whether or

7   not they have been charged with a qualifying crime and thus are subject to § 1226(c).  This view

8   would render the Laken Riley Act a meaningless amendment, since it would have prescribed

9   mandatory detention for noncitizens already subject to it.  But "[w]hen Congress acts to amend a

10  statute, we presume it intends its amendment to have real and substantial effect."  *Stone v. I.N.S.*,

11  514 U.S. 386, 397, 115 S.Ct. 1537, 131 L.Ed.2d 465 (1995); *see also Marx v. Gen. Revenue*

12  *Corp.*, 568 U.S. 371, 386, 133 S.Ct. 1166, 185 L.Ed.2d 242 (2013) ("[T]he canon against

13  surplusage is strongest when an interpretation would render superfluous another part of the same

14  statutory scheme.").  If Congress amended Section 1226 to create mandatory detention for certain

15  inadmissible noncitizens, it follows that those noncitizens were not already subject to mandatory

16  detention.  Thus, the scope of Section 1225(b)(2) cannot be as broad as the government argues.

17                          iv.

18          In addressing whether a noncitizen who has lived for years within the United States can be

19  considered "seeking admission," the BIA expressed concern that if a noncitizen is not "admitted"

20  to the United States but is not deemed "seeking admission," then the noncitizen's legal status

21  would present a "legal conundrum."  *Id.* at 221.  The BIA did not further elaborate, but

22  presumably its concern was that such an individual would have no legal status under the

23  immigration code.  This concern is misplaced.  The statute explicitly provides a term of art for

24  someone who is not "admitted" but is not currently "seeking admission": such noncitizens are

25  "applicants for admission."  As noted, otherwise the language in 1225(b)(2), which treats

26  noncitizens "seeking admission" as distinct from "applicants for admission" would be superfluous.

27  All "applicants for admission" have some legal status whether or not they are in the act of seeking

28  admission.

United States District Court
Northern District of California

21

The BIA also reasoned that petitioner's argument for a narrower construction of Section 1225(b)(2) left unanswered which applicants for admission would be covered by that section if applicants for admission who have lived within the United States for years are excluded from its reach. *Id.* In other words, the BIA believed that an interpretation of § 1225(b)(2) that does not cover all applicants for admission would render § 1225(b)(2) an empty set. Not so. Most obviously, § 1225(b)(2) applies to arriving noncitizens who are inadmissible on grounds other than 8 U.S.C. § 1182(a)(6)(C) or 1182(a)(7) (which are the grounds that put an arriving noncitizen on the track for expedited removal). The statute governing inadmissibility lists ten grounds for inadmissibility, many of which have distinct sub-grounds. *See* 8 U.S.C. § 1182(a)(1)-(10). There are thus arriving noncitizens inadmissible on these other bases who would fall under Section 1225(b)(2), as opposed to Section 1225(b)(1). Section 1225(b)(2) would not be a null set even if narrowly construed.

v.

The BIA acknowledged that the Government's interpretation of § 1225(b)(2) makes it redundant with § 1226(c)'s mandatory detention provisions, and renders superfluous Congress' recent amendment, but nevertheless maintained that this redundant interpretation is not problematic. But as noted above, this conclusion is inconsistent with conventional rules of statutory interpretation. Further, the BIA failed to recognize that interpreting §1225(b)(2) as district courts have done would not render *any* section of the immigration code superfluous. Under the district courts' interpretation, Section 1225(b)(2) has a role within the statutory framework, applying to at least arriving aliens inadmissible on grounds other than the two that allow for expedited removal, as noted above.

vi.

The BIA's consideration of the legislative history of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 is also unpersuasive. Prior to 1996, the immigration laws distinguished individuals based on "entry" rather than admission. *Hing Sum v. Holder*, 602 F.3d 1092, 1099 (9th Cir. 2010). Noncitizens who had effected an "entry" into the United States were subject to deportation proceedings, while those who had not made an "entry" were subject to

22

"more summary" exclusion proceedings.  *Id.* at 1099–100 (9th Cir. 2010).  To remedy this, the IIRIRA substituted "admission for entry" and replaced deportation and exclusion proceedings with a general "removal" proceeding.  *Id.*  In the BIA's view, this indicates that in enacting IIRIRA Congress sought to create completely level treatment for noncitizens in removal proceedings, regardless of whether they are living in the United States or encountered at the border.  It would therefore follow that a provision like § 1225(b)(2) would not differentiate between noncitizens based on their presence in the United States, or the length of that presence.

But the BIA erred in its analysis by identifying *one* of Congress' concerns in enacting IIRIRA and then treating it as Congress's sole concern driving the statute.  Congress was indeed focused on ensuring that there was "no reward for illegal immigrants or visa overstayers."  H.R. REP. 104-469, 12.  But Congress addressed this concern: the IIRIRA consolidated exclusion and deportation procedures into a single procedure and provided that noncitizens "who enter illegally or who overstay the period of authorized admission will have a greater burden of proof in removal proceedings and will face tougher standards for most discretionary immigration benefits, such as suspension of removal and work authorization." *Id.*

In making these changes, Congress did not fully disrupt the old system, including the system of detention and release.  In fact, according to the legislative record, "Section 236(a) [1226(a)] restates the current provisions in section 242(a)(1) regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States."  H.R. REP. 104-469, 229.  Congress' concern about adjusting the law in some respects to reduce inequities in the removal process did not mean Congress intended to entirely up-end the existing detention regime by subjecting *all* inadmissible noncitizens to mandatory detention, a seismic shift in the established policy and practice of allowing discretionary release under Section 1226(a) – the scope of which Congress did not alter.  *See Vazquez v. Bostock*, 779 F. Supp. 3d 1239 (W.D. Wash. 2025) (citing H.R. Rep. No. 104-469, pt. 1, at 229).

### vii.

The recent decision in *Jose Guadalupe Sixtos Chavez, et al. v. Kristi Noem, et al.*, does not change the Court's construction.  No. 3:25-cv-02325-CAB-SBC (S.D. Cal. Sep. 24, 2025), ECF

United States District Court
Northern District of California

No. 8.  In *Jose Guadalupe*, the district court denied a temporary restraining order on the grounds that the petitioners had not demonstrated "serious questions about the application of Section 1225 to aliens present in the United States."  *Id.* at p.8.  The court's analysis of Section 1225, however, was limited to determining whether the petitioners, as non-citizens present in the United States but not admitted, were "applicants for admission" under Section 1225.  *Id.*  But that is not the statutory construction issue before this Court.  Petitioners here agree that they are "applicants for admission."  They contest whether they are "applicants for admission . . . *seeking admission*" within the scope of 1225(b)(2), an issue the district court did not address at all.

The district court's superfluity analysis also misses the mark.  The district court found that the Government's expansive interpretation of 1225(b) does not render the Laken Riley amendment to Section 1226 superfluous because "Section 1226(c) simply removed the Attorney General's detention discretion for aliens charged with specific—but not all—crimes. The Attorney General may still exercise her detention discretion under § 1226(a) for any other aliens falling under that subsection who are not charged with the specific crimes carved out by § 1226(c)."  *Id.* at p. 9.  But under the Government's interpretation of 1225(b)(2), there would *already* be automatic mandatory discretion for *all* of the non-citizens newly covered by 1226(c).  In that case, there was no need to specifically provide for mandatory detention of those charged with certain crimes under Section 1226.  The district court's reading does indeed render the Laken Riley amendment superfluous.

### viii.

Finally, the Government argues for the first time in supplemental briefing that this court has failed to consider the significance of the inspection provision at § 1225(a)(3) in interpreting § 1225(b)(2).  Dkt. No. 29 at 1.  § 1225(a)(3) states:

> All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers.

The Government argues that the use of the "or otherwise" language indicates that the category of "applicants for admission" is a subset of a larger category of non-citizens "seeking admission or readmission to or transit through the United States."  But this does not follow.  All this language indicates is that there may be noncitizens seeking admission who fall outside the statutory

definition of "applicants for admission."  For example, those applying for a visa at a consulate abroad would be seeking admission but not be applicants for admission, since they are neither present in the country nor arriving in it.  *See Matter of Lemus-Losa*, 25 I&N Dec. 734, 741 (BIA 2012).  The term "otherwise seeking admission" is thus a "catch-all" to describe non-citizens who *must be inspected.  Al Otro Lado v. Exec. Office for Immigr. Review*, Nos. 22-55988, 22-56036, 2025 U.S. App. LEXIS 11683, at *33 (9th Cir. May 14, 2025).[8]  The provision does not support the Government's argument that every non-admitted noncitizen residing in the United States should be considered at all times to be "seeking admission" such that they are subject to mandatory indeterminate detention.

***

Accordingly, the Court finds the well-reasoned decisions of the many district courts that have rejected the Government's expansive view of 1225(b)(2) persuasive.

c.    Conclusion.

The Court finds no reason to deviate from its conclusion in *Aceros* rejecting the Government's novel view of 1225(b)(2). The Court concludes that even if the Government theoretically could, without process, switch detention regimes in the middle of the stream, § 1225(b)(2) provides no legal basis for the Government's detention of petitioners.  Thus, petitioners command a significant private interest in their continued liberty and the first factor therefore favors petitioners.

---

[8] *Al Otro* was concerned with determining whether non-citizens stopped right before the border had the right to apply for asylum and whether officials had a mandatory duty to inspect these noncitizens.  The court found that officers do have a mandatory duty to inspect such noncitizens, since these citizens "arrive[d] in the United States" when they reached the border, even if they did not cross it.  *Al Otro Lado*, 2025 U.S. App. LEXIS 11683, at *33.  To bolster this interpretation, the court noted that in § 1225 (a)(3) Congress provided for the inspection of the catchall categories of noncitizens "otherwise seeking admission" and "stowaways," reinforcing that the inspection provision did not exclude noncitizens stopped right before the border.

2.    Risk of Erroneous Deprivation

The second factor, the risk of erroneous deprivation, also weighs in Petitioners' favor. Once a liberty interest is established, the question is whether process – a hearing – would lessen the risk of an erroneous detention.  Where an individual has not received a bond or redetermination hearing, "the risk of an erroneous deprivation [of liberty] is high."  *Singh v. Andrews*, No. 1:25-CV-00801, 2025 WL 1918679, at *7 (E.D. Cal. July 11, 2025).  Here, the risk of erroneous deprivation is high because a hearing will likely reveal Petitioners present no risk to public safety and no risk of non-appearance.  The Government has not argued otherwise, instead resting on Section 1225's mandatory detention provisions as a matter of law.  The second factor therefore favors Petitioners.

3.    The Government's Interest

Finally, the Government has failed to show any countervailing interest against a providing a pre-detention hearing.  "In immigration court, custody hearings are routine and impose a 'minimal' cost."  *Singh*, 2025 WL 1918679, at *8 (citing *Doe v. Becerra*, No. 2:25-cv-00647-DJC-DMC, 2025 WL 691664, at *2 (E.D. Cal. Mar. 3, 2025).  There is no concern with a hearing delaying the Government's efforts to remove Petitioners either.  Any such delay would be minimal, and in any case, Petitioners are currently subject to full removal proceedings.  Even if Petitioners could be brought into expedited removal, a pre-detention bond hearing will not interfere with the proceedings.  Whether the Government conducts a pre-detention hearing – or, indeed, whether Petitioners are in detention or not – will not obstruct the removal process.  And detention for its own sake is not a legitimate governmental interest.  *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, 2025 WL 2084921, at *5 (N.D. Cal. July 24, 2025) ("Detention for its own sake, to meet an administrative quota, or because the government has not yet established constitutionally required pre-detention procedures is not a legitimate government interest.").

4.    A Pre-Deprivation Hearing Is Warranted

The Government argues that the Section 1226 framework provides only for post-detention,

United States District Court
Northern District of California

1    rather than pre-deprivation, bond hearings, and that the Ninth Circuit has found the Section 1226

2    process constitutionally sufficient.  Dkt. No. 15 at 15 (citing *Diaz v. Garland*, 53 F.4th 1189, 1196

3    (9th Cir. 2022)).  The Government is correct that if Section 1226 and its regulations are followed,

4    this provides for sufficient process, as detentions will only be made upon an initial DHS

5    determination that an individual is a flight risk or poses a danger to the community.  *See Diaz*, 53

6    F.4th at 1196 (9th Cir. 2022) (citing 8 C.F.R. § 236.1(c)(8)).  In the prolonged detention context

7    that *Diaz* addressed, the petitioner had been detained upon an initial ICE determination and

8    provided with Section 1226's mandatory bond hearing, at which an immigration judge approved

9    ICE's determination.

10        Here, the circumstances are different.  ICE already determined that the petitioners here

11   presented no danger or flight risk, and released them based on this determination.  Due to the

12   Government's erroneous position that Petitioners are subject to mandatory detention, however, it

13   detained them despite its own determination that they presented no such risks, and without any

14   finding of changed circumstances.  *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal.

15   2017).  Under these circumstances, given the government's conduct, the substantial liberty

16   interests held by Petitioners, and the fact that the government has no evidence and does not

17   contend that Petitioners present any risk of flight or to public safety, a *pre*-deprivation bond

18   hearing is warranted.  Indeed, every court in this district to address the issue has so held.  *See e.g.,*

19   *Calderon v. Kaiser*, No. 25-CV-06695-AMO, 2025 WL 2430609, at *4 (N.D. Cal. Aug. 22, 2025)

20   (ordering pre-deprivation hearing before any detention); *Ramirez Clavijo v. Kaiser*, No. 25-CV-

21   06248-BLF, 2025 WL 2419263, at *9 (N.D. Cal. Aug. 21, 2025) (same); *Diaz v. Kaiser*, No. 3:25-

22   CV-05071, 2025 WL 1676854, at *3 (N.D. Cal. June 14, 2025) (same).

23

24                                             ***

25        As each *Mathew* factor favors Petitioners, they have shown a likelihood of success on the

26   merits that due process entitles them to a bond hearing before a neutral arbiter prior to any re-

27   arrest.  Given that, as discussed below, the balance of equities tips sharply in Petitioners' favor,

28   they also satisfy this factor even if they have only raised serious questions as to the merits of their

1    claims.

2

3    B.    Petitioners Face Irreparable Harm

4         Petitioners are likely to suffer irreparable harm in the absence of preliminary injunctive

5    relief.  Petitioners are currently out of ICE custody only due to court order and there is no reason

6    to believe that the government will not immediately re-detain them as soon as the temporary

7    restraining order expires.  "Deprivation of physical liberty by detention constitutes irreparable

8    harm." *Arevalo v. Hennessy*, 882 F.3d 763, 767 (9th Cir. 2018); *see also Hernandez v. Sessions*,

9    872 F.3d 976, 994 (9th Cir. 2017) ("It is well established that the deprivation of constitutional

10   rights 'unquestionably constitutes irreparable injury.").  "When an alleged deprivation of a

11   constitutional right is involved, most courts hold that no further showing of irreparable injury is

12   necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005).  Unconstitutional

13   deprivation of liberty satisfies the burden of irreparable harm.

14

15   C.    The Balance of Equities and the Public Interest Favor Petitioners

16        "[T]he public has a strong interest in upholding procedural protections against unlawful

17   detention, and the Ninth Circuit has recognized that the costs to the public of immigration

18   detention are staggering."  *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up); *see also Index*

19   *Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) (quoting *Padilla v.*

20   *Immigration & Customs Enforcement*, 953 F.3d 1134, 1147–48 (9th Cir. 2020)) ("It is always in

21   the public interest to prevent the violation of a party's constitutional rights."); *Preminger v.*

22   *Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns are implicated

23   when a constitutional right has been violated, because all citizens have a stake in upholding the

24   Constitution.").  Further, the government "cannot reasonably assert that it is harmed in any legally

25   cognizable sense by being enjoined from constitutional violations." *Zepeda v. U.S. Immigr. & Nat.*

26   *Serv.*, 753 F.2d 719, 727 (9th Cir. 1983).  "Faced with ... a conflict between minimally costly

27   procedures and preventable human suffering, [the Court has] little difficulty concluding that the

28   balance of hardships tips decidedly in plaintiffs' favor." *Singh*, 2025 WL 1918679, at *9 (quoting

United States District Court
Northern District of California

28

1    *Hernandez*, 872 F.3d at 996).

2        The only potential injury the government faces is a short delay in detaining Petitioners if it

3    ultimately demonstrates to a neutral decisionmaker by the preponderance of the evidence that her

4    detention is necessary to prevent danger to the community or flight.  *See Pinchi v. Noem*, No.

5    5:25-CV-05632-PCP, 2025 WL 2084921, at *7 (N.D. Cal. July 24, 2025); *See Jorge M. F*, 2021

6    WL 783561; *Diaz*, 2025 WL 1676854.  While the Government cites as its interest "the steady

7    enforcement of its immigration laws," it does not explain how holding a pre-detention bond

8    hearing interferes with this end.   Dkt. No. 15 at 14.  Indeed, to the contrary, the procedures

9    undertaken by DHS of summarily detaining noncitizens who dutifully appear at ICE offices and

10    immigration courts undermines legitimate government interests.  As the DHS has previously

11    recognized, "[e]xecuting civil immigration enforcement actions in or near a courthouse may chill

12    individuals' access to courthouses, and, as a result, impair the fair administration of justice."  Dkt.

13    No. 1 ¶ 45 (citing April 27, 2021 Civil Immigration Enforcement Actions in or Near Courthouses

14    memorandum).  If anything, it is the Government that has thrown into turmoil the steady

15    enforcement of immigration law through repeated, highly public arrests in courtroom hallways.

16        Given that the Government faces no real injury from abiding by the Constitution, the

17    balance of equities tips sharply in Petitioners' favor.

18

19                    **V.    SUBSTANTIVE DUE PROCESS CLAIM**

20        Granting Petitioners' request for preliminary injunction and enjoining the government

21    from detaining them "obviates the threat of any imminent deprivation of [their] substantive due

22    process rights," so the Court need not consider their substantive due process claims at this stage.

23    *See Pinchi*, 2025 WL 2084921, at n.1; *accord Calderon*, 2025 WL 2430609, at n1.

24

25                            **VI.    CONCLUSION**

26

27        For the forgoing reasons, Petitioners' request for a preliminary injunction is **GRANTED**.

28    The Government is **ENJOINED AND RESTRAINED** from

(1) Re-detaining Petitioners without a pre-deprivation hearing before a neutral decisionmaker; and

(2) Removing Petitioners from the United States pending these proceedings.

**IT IS SO ORDERED**.

Dated: October 3, 2025

_____
EDWARD M. CHEN
United States District Judge